# In the
# United States Court of Appeals
## for the Eighth Circuit

---

AMERICAN AUTOMOBILE INSURANCE COMPANY,

*Plaintiff-Appellant,*

v.

OMEGA FLEX, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Missouri, St. Louis, No. 4:11-cv-00305-AGF.
The Honorable **Audrey G. Fleissig**, Judge Presiding.

---

## BRIEF OF APPELLANT

---

ANTHONY J. MORRONE
THADDEUS C. BARIA
COZEN O'CONNOR
333 West Wacker Drive
Suite 1900
Chicago, IL 60606
Tel: (312) 382-3100
Fax: (312) 382-8910
Email: amorrone@cozen.com
      tbaria@cozen.com

MARK E. UTKE
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2164
Fax: (215) 701-2164
Email: mutke@cozen.com

STEPHEN D. HOYNE
STEPHEN D. HOYNE
  ATTORNEY AT LAW
P.O. Box 210
St. Louis, MO 63026-0210
Tel: (314) 306-6399
Fax: (636) 225-7818
Email: stevehoyne@charter.net

*Attorneys for Appellant*

---


Appellate Case: 14-1783   Page: 1   Date Filed: 07/07/2014 Entry ID: 4172528

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

On April 30, 2010, a fire destroyed the home of Fred and Adrienne Kostecki ("the Kosteckis"). The Kosteckis assigned their recovery rights to their insurer, American Automobile Insurance Company ("American Auto"). American Auto asserts that the fire was caused by the failure of ultra-thin corrugated stainless steel gas lines manufactured by Omega Flex, Inc. under brand name TracPipe.

American Auto contends that TracPipe is unreasonably dangerous because it is too thin and melts when it becomes energized by nearby lightning strikes. The district court did not allow American Auto's expert witness, metallurgist Thomas W. Eagar, ScD., P.E., to testify at trial that, from a metallurgical standpoint, the use of ultra-thin steel for this particular product was improper. The district court ruled that Dr. Eagar was not qualified to testify about material selection and design while it allowed Omega Flex's expert, Dr. Harri Kytomaa, to testify about metallurgical and lightning issues even though he disavowed expertise in these areas. The jury returned a verdict against American Auto.

The district court abused its discretion in excluding the proffered opinion testimony of Dr. Eagar as he is eminently qualified to testify on issues of material selection and in permitting Omega Flex's expert to opine at trial on issues in which he admittedly had no expertise. American Auto requests 30 minutes of oral argument.

i

## CORPORATE DISCLOSURE STATEMENT

American Automobile Insurance Company is a member of Fireman's Fund Insurance Company and its German-based ultimate parent is Allianz SE. Allianz SE is a publicly held company that indirectly holds 10% or more of Fireman's Fund Insurance Company and its subsidiaries, including American Automobile Insurance Company.

Appellate Case: 14-1783     Page: 3     Date Filed: 07/07/2014 Entry ID: 4172528

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ...........i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ....................................................vi

JURISDICTIONAL STATEMENT ..........................................1

STATEMENT OF ISSUES ................................................2

STATEMENT OF THE CASE.................................................4

    A.    The TracPipe CSST Product .............................................5

    B.    American Auto's Investigation and Determination that TracPipe's Defective Composition Caused the Fire ............................7

        1.    Robert Wysong Concluded that the Fire Originated at Two Holes in Omega Flex TracPipe Gas Piping that were Caused by Energy from a Nearby Lightning Strike ..........................................................7

        2.    Robert Juergens Concluded that the Gas Piping System was Installed and Bonded in Accord with Applicable Provisions of the Building and Electrical Codes in Effect at the Time the Home was Constructed and in Accord with Applicable Manufacturer's Installation Instructions Including Those for TracPipe ....................................................8

        3.    Dr. Thomas Eagar Concluded that the TracPipe Holes were the Result of a Failure of TracPipe's Thin CSST Construction and that CSST was a Poor Material Choice for the Gas Piping Product, TracPipe, Sold by Omega Flex ...10

            a)    Dr. Eagar's Qualifications to Testify on Issues Concerning Metallurgy, Failure Analysis, and Product Design ..........................................................11

Appellate Case: 14-1783    Page: 4    Date Filed: 07/07/2014    Entry ID: 4172528

b) Dr. Eagar's Investigation, Analysis and Opinions .........14

C. Omega Flex's Mechanical Engineering Expert,
Dr. Harri Kytomaa..................................................................17

D. Procedural History................................................................18

SUMMARY OF APPELLANT'S ARGUMENT ..................................................20

ARGUMENT ....................................................................................................21

A. Standards for Evaluating Motions for New Trial and for
Evaluating a Witness's Qualifications to Testify as an Expert..........22

B. Dr. Thomas Eagar is Qualified to Testify that TracPipe, from a
Metallurgical and Materials Selection Standpoint, is a Defective
Product ..............................................................................25

1. Dr. Eagar Possesses Overwhelming Qualifications to
Give Opinion Testimony on the Subjects of Material
Selection and Suitability for the Metal Component of
TracPipe CSST .......................................................25

2. The District Court Placed Inappropriate Reliance on
Extra Jurisdictional Rulings Concerning Dr. Eagar's Lack
of Qualifications to Testify on Issues Outside the Scope of
the Opinion at Issue ...............................................34

3. Rule 702 Favors the Admission of Expert Testimony
and Any Personal Concerns Harbored the District Court
with Respect to Dr. Eagar's Qualifications Should Have
Been Tendered to the Jury for Consideration ..........................35

C. The District Court Did Not Apply the Same Standards in
Evaluating the Qualifications of Dr. Kytomaa to Give Metallurgical
Opinions as the Court Did with Respect to Dr. Eagar's Design
Defect Opinions....................................................................36

D. Justice Was Miscarried as a Result of the District Court's
Erroneous Rulings on Dr. Eagar's Qualifications.............................38

iv

CONCLUSION ...................................................................................................40

v

Appellate Case: 14-1783     Page: 6     Date Filed: 07/07/2014 Entry ID: 4172528

# TABLE OF AUTHORITIES

*Arcoren v. United States*,
  929 F.2d 1235 (8th Cir. 1991) ............................................................23

*Cincinnati Ins. Co. v. Omega Flex, Inc.*,
  No. 10-cv-00670, 2013 U.S. Dist. LEXIS 49378
  (W.D. Ky. April 5, 2013) ..................................................................35

*Cincinnati Ins. Co. v. Omega Flex, Inc.*,
  No. 10-cv-00670, 2013 U.S. Dist. LEXIS 69005
  (W.D. Ky. May 15, 2013) ............................................................34, 35

*DaSilva v. Am. Brands, Inc.*,
  845 F.2d 356 (1st Cir. 1988) ............................................................32

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...........................................................2, 23, 24

*Exum v. Gen. Elec. Co.*,
  819 F.2d 1158 (D.C. Cir. 1987) .......................................................32

*First Union Nat'l Bank v. Benham*,
  423 F.3d 855 (8th Cir. 2005) .....................................................*passim*

*Johnson v. Mead Johnson & Co.*,
  No. 13-1685, 2014 U.S. App. LEXIS 10541 (8th Cir. June 6, 2014) ............23, 24

*Knight v. Otis Elevator Co.*,
  596 F.2d 84 (3d Cir. 1979) ..........................................................24, 33

*Lauria v. Nat'l R.R. Passenger Corp.*,
  145 F.3d 593 (3d Cir. 1998) ........................................................24, 25

*Lauzon v. Senco Prods., Inc.*,
  270 F.3d 681 (8th Cir. 2001) ......................................................22, 23

*Martin v. Fleissner GmbH*,
  741 F.2d 61 (4th Cir. 1984) ............................................................36

Appellate Case: 14-1783    Page: 7    Date Filed: 07/07/2014 Entry ID: 4172528

*More, JB, Inc. v. Nutone Inc.*,
  No. 05-CA-338, 2007 U.S. Dist. LEXIS 102151
  (W.D. Tex. Mar. 21, 2007) ...................................................................35

*Pineda v. Ford Motor Co.*,
  520 F.3d 237 (3d Cir. 2008)................................................2, 28, 29, 30

*Robinson v. GEICO Gen. Ins. Co.*,
  447 F.3d 1096 (8th Cir. 2006) ..........................................24, 27, 28, 36

*Rottlund Co. v. Pinnacle Corp.*,
  452 F.3d 726 (8th Cir. 2006) ....................................................3, 22, 39

*Smith v. Ingersoll-Rand Co.*,
  214 F.3d 1235 (10th Cir. 2000). .........................................................24

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997)...................................................................33

*United States v. Wen Chyu Liu*,
  716 F.3d 159 (5th Cir. 2013) ........................................................31, 36

*Voegeli v. Lewis*,
  568 F.2d 89 (8th Cir. 1977) ............................................................3, 39

*Weisgram v. Marley Co.*,
  169 F.3d 514 (8th Cir.1999) *aff'd*, 528 U.S. 440 (2000) .....................23

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
  254 F.3d 706 (8th Cir. 2001) ........................................................*passim*

## Statutes & Other Authority

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1332 .....................................................................................1

28 U.S.C. § 2107(a) .................................................................................1

Appellate Case: 14-1783    Page: 8    Date Filed: 07/07/2014 Entry ID: 4172528

Fed. R. Evid. 702 ................................................................................*passim*

29 Wright & Gold, Fed. Practice and Procedure: Evidence § 6265 (1997) ...........24

Appellate Case: 14-1783    Page: 9    Date Filed: 07/07/2014 Entry ID: 4172528

# JURISDICTIONAL STATEMENT

American Auto insured the Kosteckis' home and property located at 3460 Whitby Lane in High Ridge, Missouri. The home was destroyed by fire on April 30, 2010. American Auto paid the Kostecki family to repair the damages caused by the fire and received an assignment to pursue this action. American Auto timely filed its Petition asserting causes of action for negligence and strict products liability against Omega Flex in the Twenty-Third Judicial Circuit of Jefferson County, Missouri on January 5, 2011. (A. 0056–62) Omega Flex removed the action to the Eastern District of Missouri on February 18, 2011. (A. 0004) Complete diversity exists pursuant to 28 U.S.C. § 1332 in that American Auto, a citizen of Missouri, and Omega Flex, a citizen of Pennsylvania, are citizens of different states and the amount in controversy exceeds $75,000.00. (A. 0056, 63) The U.S. District Court for the Eastern District of Missouri, the Honorable Audrey G. Fleissig, entered judgment after a jury trial in favor of Omega Flex on July 11, 2013. (A. 0247) American Auto timely filed its motion for new trial on August 7, 2013 (A. 0248–51), which the district court denied on March 5, 2014. (Add. 39–50) American Auto timely filed its Notice of Appeal on April 1, 2014 (A. 0264) and in accord with 28 U.S.C. § 2107(a). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Appellate Case: 14-1783    Page: 10    Date Filed: 07/07/2014 Entry ID: 4172528

# STATEMENT OF ISSUES

1.      Whether the District Court abused its discretion by barring metallurgist Thomas W. Eagar, Sc.D., P.E., from offering at trial his expert opinions concerning material selection and the design of Omega Flex's corrugated stainless steel product ("TracPipe").

- Fed. R. Evid. 702

- *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

- *First Union Nat'l Bank v. Benham*, 423 F.3d 855 (8th Cir. 2005)

- *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008)

2.      Whether the District Court abused its discretion in allowing Omega Flex's expert, Dr. Harri Kytomaa, a mechanical engineer and, by his own admission, an expert in neither lightning nor metallurgy, to testify at trial that the perforations in the Kostecki home's TracPipe were not caused by lightning energy based on his lightning strike analysis and his metallurgical analysis of the perforated TracPipe.

- *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001)

2

3.     Whether the District Court's exclusion of Dr. Eagar's design opinions and its admittance of Dr. Kytomaa's lightning and metallurgical opinions, when construed independently or collectively, constituted prejudicial error requiring a new trial.

- *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726 (8th Cir. 2006)

- *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001)

- *Voegeli v. Lewis*, 568 F.2d 89 (8th Cir. 1977)

3

## STATEMENT OF THE CASE

A fire destroyed the Kosteckis' home on April 30, 2010. ([Trial Tr. Vol. 1, 142] A. 0488) American Auto, insured the Kosteckis' home at the time of the fire and reimbursed the Kosteckis for their losses. American Auto thereafter obtained an assignment of the Kosteckis' rights to pursue this matter. ([Trial Vol. 1, 149] A. 0495)

American Auto's investigation of the fire determined that it was caused by the failure of a gas line designed and manufactured by the Defendant-Appellee, Omega Flex, Inc., under the brand name TracPipe. (A. 0056–62) TracPipe gas piping consists principally of corrugated stainless steel tubing ("CSST"). (Add. 36) TracPipe has a well-recognized failure mode—it is so thin that it melts when it becomes energized by a lightning strike as the energy from the lightning strike seeks a path to ground. (A. 112–16, 126) As this energy seeks a path to ground, the energy from the lightning strike will jump off the CSST, usually through the air to another nearby conductive material, in what is known as an arcing event. *Id.* The temperature generated by this lightning-induced arcing event is measured in thousands of degrees, which is easily hot enough to melt the thin skin of the CSST, even though the arcs lasts only a fraction of a second. ([Trial Tr. Vol. 2, 158] A. 0671; [Trial Tr. Vol. 2, 69] A. 0582; ([Trial Tr. Vol. 2, 212–13] A. 0725–26)

Appellate Case: 14-1783    Page: 13    Date Filed: 07/07/2014 Entry ID: 4172528

When this occurs, the gas is allowed to escape and is ignited simultaneously by the melting event, causing a gas-fueled fire.[1] ([Trial Tr. Vol. 2, 230–32] A. 0743–45)

On the evening the fire occurred, a thunder and lightning storm passed through the vicinity of the Kosteckis' home. ([Trial Tr. Vol. 1, 156] A. 502) In this case, American Auto determined that lightning struck a tree near the Kostecki home. American Auto contended at trial that the energy from this lightning strike traveled into the ground tree where the home's underground propane was located. The energy from this lighting strike entered the home via the home's incoming copper gas line. Continuing its search for a path to ground, the energy traveled to and Omega Flex's gas lines where it eventually arced causing the rupture of the CSST gas line and the fire.

## A.   **The TracPipe CSST Product**

Omega Flex marketed its CSST gas piping, TracPipe, as a replacement for traditional, thicker black iron pipe. ([Trial Tr. Vol. 3, 67] A. 0824) TracPipe is of simple construction. Its "simple design components" consist of "CSST pipe and plastic sheat[h]ing." (Add. 36) "It has no moving parts and no complex mechanisms or mechanical interactions." *Id.* TracPipe CSST is only ten mils thick—as thin as four sheets of paper. ([Trial Tr. Vol. 2, 203–04] A. 0716–17)

---

[1] Omega Flex does not dispute that energy from the lightning strike caused the fire, nor does it dispute that the holes in its gas lines were caused by an electrical event. ([Trial Tr. Vol. 4, 40–41] A. 1003–04)

5

Traditional black iron pipe is ten times thicker than TracPipe CSST. *Id.* Michael Stringfellow, Omega Flex's lightning expert who did not testify at trial, testified in his deposition that "While the gas industry has recognized as far back as 1835 that lightning presented a danger to gas lines, this product was placed into the marketplace without any consideration having been given to lightning." (A. 0079–83)

Mark Albino is the current executive vice president and chief operating officer of Omega Flex. ([Trial Tr. Vol. 3, 58] A. 0815) Albino testified at trial that Omega Flex was aware of lightning energy playing a role in incidents where TracPipe had been found to be perforated since 2000.[2] ([Trial Tr. Vol. 3, 80, 86] A. 0837, 0843) Omega Flex admits to not testing TracPipe to evaluate its resistance to lightning prior to placing it on the market. ([Trial Tr. Vol. 3, 80], A. 0837) At trial, Albino testified that Omega Flex incorporated a requirement that its TracPipe CSST systems be bonded to a home's grounding system to, in part, combat the potential for failure in the event that the home's system became charged with energy from a nearby lightning strike. ([Trial Tr. Vol. 3, 78–84] A.

---

[2] There is evidence that by 1998 the entire CSST industry was aware that its product was vulnerable to lightning-induced failures. (A. 0092). By 1999, Omega Flex sought to redesign its product to protect against lightning-induced failures. (A. 0106–10)

6

0835–41)  He admitted that Omega Flex performed no testing to confirm whether bonding would accomplish this goal.  ([Trial Tr. Vol. 3, 94–95] App. 0851–52)

## B.   Americam Auto's Investigation and Determination that TracPipe's Defective Composition Caused the Fire

The Kosteckis started construction of their home in late 2000 and moved into it in January 2002.  ([Trial Vol. 1, 132] A. 0478)  The home had two fireplaces fueled by propane gas.  ([Trial Vol. 1, 137] A. 0483)  The tank for the propane gas was located below ground on the east side of the home.  ([Trial Vol. 1, 139] A. 0485)  A buried copper line transported propane fuel from the tank to the gas system inside the home where it was connected to black iron pipe.  ([Trial Tr. Vol. 2, 55] A. 0568)  The gas system transitioned from black iron pipe to CSST gas piping which was connected to the home's gas fireplaces.  ([Trial Tr. Vol. 2, 58–59] A. 0571–72)  Fire investigator Robert Wysong and electrical engineer Robert Juergens inspected the fire scene to assist American Auto in determining the origin and cause of the fire.

### 1.    *Robert Wysong Concluded that the Fire Originated at Two Holes in Omega Flex TracPipe Gas Piping that were Caused by Energy from a Nearby Lightning Strike*

After the fire, American Auto retained Robert Wysong, a Certified Fire Investigator with 30 years of experience investigating the origin and cause of fires, to investigate the Kostecki fire scene.  ([Trial Tr. Vol. 2, 38–39, 43] A. 0551–52,

7

0556) During the course of his investigation Wysong found no evidence that the Kosteckis' home was struck by lightning but noted that a tree near the propane tank had been struck by lightning. ([Trial Tr. Vol. 2, 47–48] A. 0560–61) Wysong identified the area of the home in the basement in which the fire started.[3] ([Trial Tr. Vol. 2, 54] A. 0567) In the area of origin, Mr. Wysong found an Omega Flex TracPipe CSST gas line that had two holes in it which he determined to be the point of origin of the fire. ([Trial Tr. Vol. 2, 60, 64] A. 0573, 0577) Wysong concluded that electricity from a lightning strike to the tree near the propane tank energized the home's gas piping system and breached the CSST piping in the area of origin which ignited the propane fuel causing the fire. *Id.*

      *2.    Robert Juergens Concluded that the Gas Piping System was Installed and Bonded in Accord with Applicable Provisions of the Building and Electrical Codes in Effect at the Time the Home was Constructed and in Accord with Applicable Manufacturer's Installation Instructions Including Those for TracPipe.*

Robert Juergens, a licensed Professional Engineer, also assisted in the investigation of the Kostecki fire. (Trial Tr. Vol. 2, 102] A. 0615) Mr. Juergens is a forensic electrical engineer and prior to that was a design electrical engineer where his experiences included designing lightning protection systems for power plants. (Trial Tr. Vol. 2, 102, 106–07] A. 0613, 0619–20) American Auto asked

---

[3] Omega Flex's fire investigator David Smith agreed generally with Mr. Wysong's conclusion as to where the fire started. ([Trial Tr. Vol. 3, 152] A. 0908)

Appellate Case: 14-1783    Page: 17    Date Filed: 07/07/2014 Entry ID: 4172528

Juergens to determine whether lightning was a potential ignition source, whether the home's electrical system played a role in causing the fire, and whether the home was built in a code compliant manner. ([Trial Tr. Vol. 2, 109] A. 0622) Juergens eliminated a failure of the home's electrical system as a cause of the fire ([Trial Tr. Vol. 2, 126] A. 0639) and he also determined that the house was built in a code complaint manner.[4] ([Trial Tr. Vol. 2, 131–135] A. 0644–48). He also determined that the gas lines were properly bonded, consistent with code and Omega Flex's installation instructions. ([Trial Tr. Vol. 2, 139–145] A. 0652–58)

Like Wysong, Juergens found no evidence that the Kosteckis' home had been victim to a direct lightning strike. ([Trial Tr. Vol. 2, 146–147] A. 0659–60)

---

[4] One issue at trial, but not necessarily on appeal, was whether the gas lines were installed properly as it relates to bonding. Referring to the local building codes and the version of the National Electric Code ("NEC") in effect at the time the Kosteckis' home was built, Juergens concluded that, from an electrical grounding standpoint, the TracPipe gas piping system had been installed correctly and was properly bonded. ([Trial Tr. Vol. 2, 131–35] A. 0644–48) Juergens explained that the relevant version of the NEC required the bonding of gas piping that may become energized. ([Trial Tr. Vol. 2, 136, 39] A. 0649, 0652) The phrase "may become energized" with respect to a gas line under the NEC refers to a gas line that feeds a gas appliance that has an electrical power supply such as a gas furnace with a blower. ([Trial Tr. Vol. 2, 136] A. 0649) Bonding, explained Juergens, was a means of protecting people from electric shock from household electricity, and was not intended to protect people and gas piping systems from lightning energy. ([Trial Tr. Vol. 2, 136–37] A. 0649–50) Only one of the two fireplaces in the Kostecki home, explained Juergens, required bonding. ([Trial Tr. Vol. 2, 137] A. 0650) Juergens concluded that both the fireplace (which had an electric blower) and the Tracpipe were properly bonded according to the NEC, the fireplace manufacturer's instructions and Omega Flex's installation instructions. ([Trial Tr. Vol. 2, 139–45] A. 0652–58)

9

He also concluded, like Wysong, that a tree near the home's underground propane tank had been struck by lightning. ([Trial Tr. Vol. 2, 148–50] A. 0661–63) He identified a lightning strike to the tree as an ignition source for the fire explaining that the underground "copper line and that tank are going to act as an antenna, and that energy is going to be highwayed [sic] into the house over that copper line." ([Trial Tr. Vol. 2, 150] A. 0663) Juergens also observed the holes in the TracPipe located in the fire's area of origin. He testified that the holes were consistent arcing associated with lightning, but he deferred to Dr. Thomas Eagar to analyze them and confirm this hypothesis. ([Trial Tr. Vol. 2, 151] A. 0664)

> 3.    *Dr. Thomas Eagar Concluded that the TracPipe Holes were the Result of a Failure of TracPipe's Thin CSST Construction and that CSST was a Poor Material Choice for the Gas Piping Product, TracPipe, Sold by Omega Flex*

Dr. Eagar is one of the foremost experts in the world regarding the interrelationship between metals and the forces that act upon metals. The several accolades bestowed upon Dr. Eagar for his work in the fields of metallurgy and engineering include membership in the National Academy of Sciences, a group of the country's topmost 3,000 scientists, as a member of the National Research Council. ([Trial Tr. Vol. 2, 194–95] A. 0707–08) He is also a member of the National Academy of Engineering, recognized as the top 2,000 engineers in the United States. *Id.*

10

a)    Dr. Eagar's Qualifications to Testify on Issues Concerning
      Metallurgy, Failure Analysis, and Product Design

Dr. Eagar is the former Chairman of the Department of Material Sciences and Engineering at the Massachusetts Institute of Technology ("MIT") where he has been on the faculty for 37 years.  ([Trial Tr. Vol. 2, 192–93] A. 0705–06; see also A. 0128–29)  Dr. Eagar earned his Bachelor's Degree from MIT in the field of Metallurgy, along with a Doctorate in Sciences, also awarded from MIT.  *Id.*  He is presently a professor of materials engineering and engineering systems.  *Id.*  During his tenure at MIT, Dr. Eagar has also served as the head of the manufacturing programs and head of the materials processing center.  *Id.*  Dr. Eagar's subspecialties include arc physics—the physics and chemistry of welding—a field he has studied and taught for more than 30 years.[5]  ([Trial Tr. Vol. 2, 198–99] A. 0710–11)  Dr. Eagar has also taught graduate level courses at MIT on product design and materials selection.  (A. 0131)  His experience at MIT as a professor also includes, among other things, teaching undergraduate and graduate level courses in metallurgy, materials processing, engineering, deformation processing and thermodynamics.  *Id.*

---

[5] Lightning is just the type of arc, a high pressure arc, the properties and effects of which Dr. Eagar has both studied and taught.  ([Trial Tr. Vol. 2, 198–99] A. 0711–12)

11

Appellate Case: 14-1783    Page: 20    Date Filed: 07/07/2014 Entry ID: 4172528

Dr. Eagar has authored over 220 published articles, 200 of which were peer reviewed. Of those articles, 125 to 150 are on the subject of metallurgy and approximately 50 of the 200 peer reviewed articles concern arc physics or a combination of arc physics and metallurgy. The balance of the articles are on the subjects of manufacturing and design. ([Trial Tr. Vol. 2, 199–200] A. 0712–13) Several of his publications implicate the role of materials in product design and manufacturing. For example, he studied the collapse of the World Trade Center and published his analysis in 2001.[6] (A. 0145) In 1994 he was published on the subject of failure avoidance in advanced structural materials. (A. 0144) In 1995 his article titled "Bringing New Materials to Market" was published in <u>Technology Review</u>. (A. 0142) Dr. Eagar is also a contributor to the <u>ASM Handbook</u>, a multi-volume reference consulted by metals-focused materials engineers and scientists since its first publication in 1948—a metallurgists' version of Prosser on Torts. The Handbook's most recent edition includes material authored by Dr. Eagar regarding methods of analyzing arcing events on metal surfaces. (A. 0193–200)

Dr. Eagar described at trial several military and government projects that he had undertaken for the United States. For the National Aeronautics and Space Administration ("NASA"), Dr. Eagar was called upon to identify why the design

_____

[6] Dr. Eagar was the most cited author on the collapse for several years. ([Trial Tr. Vol. 2, 197–98] A. 0710–11)

Appellate Case: 14-1783    Page: 21    Date Filed: 07/07/2014 Entry ID: 4172528

of liquid hydrogen tanks produced for the X-33 spacecraft failed. ([Trial Tr. Vol. 2, 196–97] A. 0709–10) Recently, Dr. Eagar has reviewed the technology for the U.S. Army Board of Armor and Armaments, the group charged with developing tank armor, tank armor penetrators and techniques to defeat improvised explosive devices. ([Trial Tr. Vol. 2, 193–94] A. 0706–07) One project for the Navy concerned adapting particle beam weapons developed during the Cold War for use in the welding of metals used in the construction of submarines. ([Trial Tr. Vol. 2, 195–96] A. 0708–09) Dr. Eagar was intimately involved in another Navy project concerning the welding of thick titanium for submarines. *Id.* For the Air Force, he served on a committee tasked with developing faster, more efficient engines for aircraft. ([Trial Tr. Vol. 2, 194–95] A. 0707–08) He has also testified before the United States Congress and the United States Department of Energy on issues relating to metallurgy, manufacturing material science. ([Trial Tr. Vol. 2, 198] A. 07011; A. 0130) In the private sector, Dr. Eagar consulted with Learjet regarding appropriate bonding of Learjet's electrical systems for their jets. (A. 0202–03)

Dr. Eagar has worked with stainless steels, the type of which TracPipe CSST consists, for 30 years. The holder of 15 patents, Dr. Eagar has designed devices, processes and materials. For example, he designed and patented two silver metal alloys, designed and patented abrasive materials, and designed and patented a device for intercepting laser energy during laser surgical procedures. (A. 0148–49)

13

Appellate Case: 14-1783    Page: 22    Date Filed: 07/07/2014 Entry ID: 4172528

b)    Dr. Eagar's Investigation, Analysis and Opinions

Dr. Eagar evaluated the thickness of TracPipe CSST from a design

perspective in light of the types of forces it likely would have encountered once

installed and whether a single point bond could protect CSST from lightning-

induced current and voltage.  (A. 0151–80)  Dr. Eagar also evaluated the holes in

the Kostecki CSST by metallurgical analysis in order to determine what caused

them.  *Id.*  Lastly, Dr. Eagar evaluated whether an arc event involving CSST could

simultaneously ignite escaping gas from the hole.  *Id.*  As part of  his assignment,

Dr. Eager: (1) reviewed the material data sheets for TracPipe CSST, (2) performed

laboratory testing on TracPipe CSST, (3) conducted an EDS analysis[7] and a SEM[8]

review of the area immediately around the holes in the Kostecki CSST, and (4)

researched the effects lightning energy has on metals.  *Id.*

Dr. Eagar testified at trial that black iron pipe, which measures 0.11 inches

thick, has been used to transport gas in residential and commercial applications for

---

[7] Energy dispersive X-ray analysis, also known as EDS, EDX or EDAX, is a
technique used to identify the elemental composition of a sample or small area of
interest on the sample. During EDS, a sample is exposed to an electron beam
inside a scanning electron microscope (SEM). These electrons collide with the
electrons within the sample, causing some of them to be knocked out of their
orbits. The vacated positions are filled by higher energy electrons which emit x-
rays in the process. By analyzing the emitted x-rays, the elemental composition of
the sample can be determined. EDS is a tool for microanalysis of elemental
constituents.

[8] A scanning electron microscope scans the surface of a specimen with a beam of
electrons that are reflected to form an image magnified many times over.

Appellate Case: 14-1783    Page: 23    Date Filed: 07/07/2014 Entry ID: 4172528

around 100 years.  ([Trial Tr. Vol. 2, 202] A. 0715)  TracPipe, according to Dr.

Eagar, is only 10 percent as thick as black iron pipe—0.011 inches.  ([Trial Tr.

Vol. 2, 203] A. 0716)  The significance is that from a metallurgical standpoint, the

energy required to melt metal is proportional to its increase in thickness—if one

material is twice as thick as the other, it takes four times as long for the same

amount energy to melt the thicker material.  ([Trial Tr. Vol. 2, 204–05] A. 0717–

18)

     After examining the surface of the metal spatter surrounding the holes in the

TracPipe and performing a heat flow calculation based on Fourier's Second Law of

Heat Conduction, Dr. Eagar concluded that the holes were caused by lightning

energy.  ([Trial Tr. Vol. 2, 212–13] A. 0725–26)  Relying on a study conducted by

an engineer for General Electric performed in the 1940s, Dr. Eagar calculated the

amount of energy required to penetrate TracPipe CSST similar in dimension to the

perforations on the Kosteckis' TracPipe gas line to be 2.4 coulombs.[9]  ([Trial Tr.

Vol. 2, 207]A. 0720)  From a metallurgical standpoint, Dr. Eagar explained that

---

[9] A coulomb is a measure of the number of electrons.  It is related to the electrical
measurement of amperes, which relates to a coulomb per second.  Thus, an ampere
is the measure of "electron flow."  ([Trial Tr. Vol. 2, 205–06] A. 0718–19)  The
formula derived from the 1940s experiments, has been relied on by the scientific
community for 70 years, particularly by metallurgists in the aircraft industry who
study lightning to avoid lightning-induced perforations in aircraft fuel tanks.
([Trial Tr. Vol. 2, 209] A. 0722)  In testimony stricken from the record, Dr. Eagar
explained that he has calculated that it takes 5,000 times as much energy to
penetrate black iron pipe.  ([Trial Tr. Vol. 2, 207–08] A. 0720–21)

15

CSST was too thin to resist a charge of that size.  ([Trial Tr. Vol. 2, 214–15] A. 0727–28)  He noted that the average lightning strike releases three to five coulombs and that it takes only one tenth of a coulomb to penetrate CSST.  ([Trial Tr. Vol. 2, 215] A. 0728)  Dr. Eagar concluded that the hole produced by the 2.4 coulombs of lightning energy generated molten metal at 2,500 degrees Fahrenheit around the holes.  ([Trial Tr. Vol. 2, 236–37] A. 0749–50)  In his opinion, the molten material ignited the propane escaping through the hole in the TracPipe at the time it was formed.  ([Trial Tr. Vol. 2, 237] A. 0750)

Although the district court recognized Dr. Eagar as an expert in the field of metallurgy and arc physics ([Trial Tr. Vol. 2, 201] A. 0714), he was prevented from further explaining the failure mode at trial.  ([Trial Tr. Vol. 2, 230] A. 0743)  Based on the district court's order of June 11, 2013, Dr. Eagar could not testify that from a design perspective, Omega Flex's material selection for its TracPipe product was (1) ill-suited for the application and (2) the result of an improper design process undertaken by Omega Flex.  According to the district court, Dr. Eagar was allowed to testify as to matters within his expertise—metallurgy and arc physics—and he was allowed to offer his opinions regarding fire causation in

16

relation to metallurgy and arc physics. (Add. 15) However, testimony outside of these areas related to product design and warnings[10] was excluded. *Id.*

### C. Omega Flex's Mechanical Engineering Expert, Dr. Harri Kytomaa

Omega Flex tendered Dr. Harri Kytomaa to the court as an expert on materials, mechanical engineering, fire cause and origin, code review, and electrical causation at trial. ([Trial Tr. Vol. 3, 169] A. 0926) American Auto performed a limited voir dire in which Dr. Kytomaa admitted that he was not a metallurgist. ([Trial Tr. Vol. 3, 170] A. 0927) American Auto objected to Dr. Kytomaa's qualifications as an expert to the extent that any opinions he had were metallurgical in nature. *Id.* Over American Auto's objection, the district court allowed Dr. Kytomaa to criticize the metallurgical analysis of the failure conducted by Dr. Eagar. ([Trial Tr. Vol. 3, 172] A. 0929)

Despite his admission that he is not a lightning expert,[11] Dr. Kytomaa concluded that there was not enough energy in the lightning strike to create the holes found in the CSST. ([Trial Tr. Vol. 4, 19, 26] A. 0982, 0989) He also opined that the propane coming out of the holes formed in the Kosteckis' TracPipe would not have ignited when it came into contact with the molten edges of the

[10] Prior to trial, American Auto made it clear that Dr. Eagar would not be offering opinions on warnings.

[11] (A. 0205–08)

17

holes. ([Trial Tr. Vol. 4, 27–28] A. 0990–91) Dr. Kytomaa was also allowed to attack Dr. Eagar's metallurgical analysis of the holes in the TracPipe, specifically contending that one cannot tell based on an analysis of the holes' characteristics including the edges and spatter that the holes were caused by lightning current. ([Trial Tr. Vol. 4, 47] A. 1010)

### D. **Procedural History**

American Auto timely filed its Petition asserting causes of action for negligence and strict products liability against Omega Flex in the Twenty-Third Judicial Circuit of Jefferson County, Missouri on January 5, 2011. (A. 0056) Specifically, American Auto contended that TracPipe was unreasonably dangerous because it was susceptible to failures when charged with the energy of a lightning strike and that Omega Flex was negligent in designing TracPipe for having, among other things, failed to properly design and test the TracPipe product. (A. 0056–62) Omega Flex removed the action to the Eastern District of Missouri on February 18, 2011. (A. 0056–62)

At the close of discovery, the parties simultaneously moved to exclude certain opinion testimony of each other's expert witnesses. American Auto moved the district court to exclude the opinion testimony of Dr. Kytomaa contending his opinions were derived from a flawed methodology and that he did not have the requisite background to render such opinions. (A. 0075–78) The district court

denied American Auto's motion with respect to Dr. Kytomaa. (Add. 17) Omega Flex moved to exclude all of Dr. Eagar's opinion testimony. Relevant to the issues on appeal, Omega Flex contended that Dr. Eagar admitted that he was not an expert in the design of "CSST systems" and was that he was therefore unqualified to give opinion testimony on the design of the CSST product itself. (ECF No. 52 at 29) American Auto argued in opposition that Dr. Eagar is eminently qualified to opine that Omega Flex's use of thin-walled CSST for TracPipe. The district court accepted Omega Flex's argument and on June 11, 2013 ruled that American Auto did not show, by a preponderance of the evidence, that Eagar was qualified as an expert with respect to product design. (Add. 13) The district court stated that Eagar "specifically disavowed such expertise and his areas of expertise bear no more than a remote relationship to product design[.]" *Id.*

The jury returned a verdict for Omega Flex on American Auto's claims that Omega Flex failed to use ordinary care in designing the TracPipe and that TracPipe was unreasonably dangerous and defective. ([Trial Tr. Vol. 4, 156–57] A. 1119–20) Judgment was entered in favor of Omega Flex on July 12, 2013. (A. 0247) On August 7, 2013, American Auto moved for a new trial on the grounds that the district court's exclusion of Dr. Eagar's opinion that TracPipe's design was deficient from a metallurgical and materials selection standpoint. (ECF No. 188)

19

The district court denied the motion on March 5, 2014 (A. 0248–51), and American Auto timely filed its notice of appeal on April 1, 2014. (A. 0052)

## SUMMARY OF APPELLANT'S ARGUMENT

The district court abused its discretion in ruling that Dr. Eagar was unqualified to testify that TracPipe's design was defective as the material selected by Omega Flex was ill-suited for its application. Dr. Eagar's vast knowledge on the subject matter of design and materials selection developed through his work, research, and teaching in the subject matters of metallurgy and arc physics. The fields in which he has worked for over 30 years are disciplines directly involved in diagnosing the failure mechanism and dangerous nature of TracPipe CSST. The district court, however, considered Dr. Eagar's expertise too remote to the issue of material selection as it relates to CSST. The district court's analysis was flawed in that it failed to properly apply the legal standards in assessing Dr. Eagar's qualifications, misconstrued the nature of Dr. Eagar's proffered opinion, placed heavy reliance on the irrelevant concept of "CSST system design," and distorted the crux of the orders of other district courts concerning Dr. Eagar's testimony in other areas. The district court's flawed analysis is further illustrated by its allowing Dr. Harri Kytomaa, a mechanical engineer with no expertise in either metallurgy or arc physics, to give opinion testimony on lightning currents and purely metallurgical subject matters at trial.

20

The district court's evidentiary rulings concerning Dr. Eagar and Dr. Kytomaa caused American Auto undue and harmful prejudice at trial. American Auto's experts undertook a complex and technical investigation in evaluating the cause of the fire at the Kostecki home and the manner in which TracPipe failed. The jury in this case was called upon to understand overwhelming technical testimony in this case and Dr. Eagar's excluded opinion would have assisted the jury in answering the question of whether Omega Flex was negligent in designing TracPipe and whether TracPipe's design was unsafe and defective. On the other hand, Dr. Kytomaa, who was admittedly not a metallurgist, was allowed to attack Dr. Eagar's metallurgical opinions at trial. The district court's rulings were inconsistent, prejudicial and abusive of the discretion it is allowed in its gatekeeping role.

## ARGUMENT

The district court did not apply the appropriate review in evaluating whether Dr. Eagar was qualified to testify about the design of TracPipe. The court failed to consider all factors relevant to assessing a proffered witness's expert qualifications. The district court also improperly focused on Dr. Eagar's admission that he was not an expert in the design of "CSST systems" and on another district court's exclusion of Dr. Eagar's opinions concerning TracPipe's warnings. In denying American Auto's motion for a new trial, the district court failed to recognize that

21

its exclusion of Dr. Eagar's design opinion deprived the jury of assistance in fully evaluating the safety of the product. American Auto was unable to present to the jury all relevant and helpful evidence allowed by the Rules of Evidence and, as a result of the district court's flawed evidentiary rulings, the jury returned a verdict for Omega Flex.

## A.   Standards for Evaluating Motions for New Trial and for Evaluating a Witness's Qualifications to Testify as an Expert

In considering a motion for new trial, the district court must determine "whether an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result." *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 731 (8th Cir. 2006) (quotations omitted) (reversing district court's denial of a new trial where district court admitted unhelpful expert opinion testimony). A district court's denial of a motion for new trial is reviewed for abuse of discretion. *Id.*

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Lauzon*, 270 F.3d at 686 (concluding district court's exclusion of expert testimony was an abuse of discretion and "fell outside [Rule 702's] spirit of admissibility"); *Weisgram v. Marley Co.,* 169 F.3d 514, 523 (8th Cir.1999) *aff'd*, 528 U.S. 440 (2000); see also *Johnson v. Mead Johnson & Co.*, No. 13-1685, 2014 U.S. App. LEXIS 10541 at *12 (8th Cir. June 6, 2014) (recognizing that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702 "greatly liberalized" the standards of admission of expert scientific testimony). "The rule clearly 'is one of admissibility rather than exclusion.'" *Id.* (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)).

Expert opinion testimony should be admitted when: (1) it is useful to the finder of fact in deciding the ultimate issue of fact when the evidence is based on scientific, technical or other specialized knowledge; (2) the proposed witness is qualified to assist the finder of fact; and (3) the proposed evidence is "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it

23

provides the assistance the finder of fact requires[.]" *Id.* (quotations and citations omitted). With respect to the proffered witness's qualifications, Rule 702 "expressly allows a witness to qualify as an expert based on his own knowledge, skill, experience, training or education." *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005).

While the Eighth Circuit adheres to the abuse-of-discretion "standard for review of the district court's Rule 702 gatekeeping decision, cases are legion that, correctly, under *Daubert*, call for the liberal admission of expert testimony." *Johnson*, 2014 U.S. App. LEXIS 10541 at *12. "The purpose of the *Daubert* gatekeeping function is not to measure every expert by an inflexible set of criteria but to undertake whatever inquiry is necessary to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006) (citing 29 Wright & Gold, Fed. Practice and Procedure: Evidence § 6265 (1997) and *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 598 (3d Cir. 1998)); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir. 1979). "[I]t is an abuse of

Appellate Case: 14-1783    Page: 33    Date Filed: 07/07/2014 Entry ID: 4172528

discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Lauria*, 145 F.3d at 598–99.

**B.** **Dr. Thomas Eagar is Qualified to Testify that TracPipe, from a Metallurgical and Materials Selection Standpoint, is a Defective Product**

*1. Dr. Eagar Possesses Overwhelming Qualifications to Give Opinion Testimony on the Subjects of Material Selection and Suitability for the Metal Component of TracPipe CSST*

The district court plainly erred in ruling that Dr. Eagar was unqualified to opine at trial that the selection of 0.011-inch thick stainless steel for TracPipe constituted a design flaw. Dr. Eagar has demonstrated specialized and scientific knowledge in the fields of metallurgy, arc physics, product design, manufacturing and engineering. His consulting experience exemplifies Dr. Eagar's technical and scientific capabilities. Dr. Eagar's design experience includes teaching a generation of engineers about materials and material selection. He is also the holder of patents for a laser surgery device and metal alloys, all of which seems to have been overlooked by the district court. These represent just a few of Dr. Eagar's credentials that relate to the issues at trial which included a metallurgical evaluation of the holes in the TracPipe, a metallurgical evaluation of the ability of CSST to withstand energy from lightning strikes, and materials selection. The materials selection and design of the two-component TracPipe product fall

25

squarely within Dr. Eagar's realm of expertise. Moreover, Dr. Eagar's opinion with regard to design and material selection would have assisted the jury in navigating the technical and complex testimony trial testimony that touched on lightning and electrical concepts, metallurgy, bonding, and building and electrical codes.

The district court failed to consider Dr. Eagar's knowledge, skill, experience, training, and education in the totality and relative to product design when it ruled that he was unqualified to testify that TracPipe is defective from a metallurgical and materials selection standpoint. Only when the combination of a witness's knowledge, skill, training, education and experience in a subject is "sorely lacking" should an expert be deemed unqualified. *First Union*, 423 F.3d 855. *First Union* was a legal malpractice action that arose from a planned merger of the plaintiff with another corporation. *Id.* at 858. The plaintiff alleged that the defendant attorney allowed an Arkansas statute of limitations to expire after receiving an objection to a stock valuation by a dissenting stockholder. *Id.* at 858–59. The plaintiff proffered an Arkansas attorney with merger and acquisition experience as its expert witness. This Court held that the district court abused its discretion in barring the plaintiff's expert's testimony on the issue of legal malpractice where the expert was licensed as an attorney for over 36 years, practiced extensively in the area of mergers and acquisitions, was familiar with the

26

statute at issue and relied on his experience and facts and circumstances of the case at hand in forming his opinions.  *Id.* at 863.

This Court remarked that the district court's ruling "cannot be reconciled with Rule 702, which expressly allows a witness to qualify as an expert based on his own knowledge, skill, experience, training or education."  *Id.*  The circuit court recognized that a lack of personal experience in an area of testimony may call for the exclusion of certain opinions by an otherwise eminently qualified witness only when the witness "sorely lack[s] the *education, employment, or other practical personal experiences* to testify as an expert" regarding practices in an area generally unrelated to the witness's area of expertise.  See *id.* (citing *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001)); see also *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006) (neurologist's experience as a physician, though not at orthopedist, and his independent study of the subject qualified him to testify concerning the type of injury one would sustain by an impact to the shoulder).

Had the district court followed this Court's analysis in *First Union*, it would have found Dr. Eagar qualified to give opinion testimony concerning the defective design of TracPipe.  Like the expert witness in *First Union* who had over 30 years of experience as an attorney in the mergers and acquisitions practice area, Dr. Eagar has over 30 years of experience in the general field of engineering and

27

design specializing in metallurgy and arc physics. Dr. Eagar has design experience and is familiar with the design process as evidenced by the 15 patents he holds—several of which are for alloys and one of which is for a laser energy device, and all of which are arguably more complex than Omega Flex's two-component TracPipe product. Moreover, the main component of TracPipe—stainless steel—is one with which Dr. Eagar has worked for 30 years. Dr. Eagar has even been involved in analyzing the failures of liquid hydrogen tanks for a NASA spacecraft. In addition, even if one were to consider his knowledge of engineering design principles as merely general in nature, he is familiar with those principles from his work with his patented inventions and as a professor at MIT on the subject. As such, the circumstances align with those in *First Union* and *Robinson* rather than those of *Wheeling* because Dr. Eagar's experience and specialized knowledge with respect to metals, material selection and product design unquestionably relate to the design considerations of a simple, two-component product.

The Third Circuit case, *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008), illustrates that a court should consider the substance of witness's qualifications over particularized experience. In *Pineda*, the plaintiff was injured when the rear liftgate glass of a Ford vehicle shattered. *Id.* at 239–40. He retained a professional engineer as an expert who opined that the design of the glass was "defective in that it was only marginally able to resist fracture in its intended

28

service and the pertinent [documents] lacked adequate instructions and warnings." *Id.* (quotations omitted). The witness held a Master of Science in Metallurgical Engineering and Material Science, "spent considerable time studying fracture mechanics," and had "consulted with the legal profession on over two hundred cases involving the failure of glass or other ceramics[.]" The witness admitted in his deposition that he was not a warnings expert and that his opinions pertaining to design defects were based on comparisons of warranty claims and third-party opinions. *Id.* at 241. The district court excluded the witness's testimony in the entirety; however, the circuit court reversed holding that the witness was qualified to testify on the warnings issue.[12] The circuit court noted that the "liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Id.* at 244. "Looking beyond [the] single statement" that he did not hold himself out as a warnings expert, the circuit court concluded that the witness's "expertise in the stresses and other forces that might cause a material such as glass to fail was more than sufficient to satisfy Rule 702's substantive qualification requirement." *Id.* at 245.

Like the district court that was reversed in *Pineda* the district court in the underlying matter neglected Dr. Eagar's formal and substantive qualifications. Dr.

---

[12] Pineda dropped his design defect claims proceeding only with its failure to warn claims. *Id.* at 242.

29

Eagar possesses credentials similar to, if not more prestigious than, the expert witness in *Pineda* relative to the issues in this case. Dr. Eagar has spent decades studying the behavior of metals when subjected to electric arcs, he has designed metal alloys and laser devices, and he has experience diagnosing metal and materials failures in a wide array of matters that include the collapse of the World Trade Center and the failure of spacecraft hydrogen tanks. Dr. Eagar's formal qualifications underlie the substantive quality of his knowledge and experience; however, the district court gave little weight to the substance of Dr. Eagar's experiences and barred him from opining about TracPipe's design.

The district court also improperly seized upon Dr. Eagar's deposition testimony in other litigation concerning CSST failures where he did not hold himself out as an expert in the "design of corrugated stainless steel systems" and assigned to this testimony an erroneous interpretation. (Add. 12–13) The district court apparently considered this testimony a "disavowal" of expertise in product design. *Id.* However, a "CSST system" is plainly distinct from a *product* that consists of only a stainless steel tube and a plastic jacket. Indeed a "CSST system" is, according to Omega Flex, a gas piping *system* in a residential or commercial building. (ECF No. 52, at 29)

The court's order placed some significance on the actual installation of a CSST system and suggests that if Dr. Eagar had plumbed a home with CSST that

he would then be qualified to opine on whether the use of stainless steel only eleven thousandths of an inch (10 mils) thick was appropriate. The district court's flawed logic would suggest that a plumber, who ran a series of CSST gas lines in a home, would be a designer of a CSST system such that he would somehow be more qualified than Dr. Eagar to speak to the appropriateness of the material properties of the pipe to resist electrical energy.

Even if one were to assume *arguendo* that Dr. Eagar had no product design experience or that a lack of "CSST system" design experience is in any way relevant, the district court's ruling as to his qualifications was still in error because the district court did not consider the other factors for qualifying witnesses as experts under Rule 702. "A lack of personal experience . . . should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: knowledge, skill, experience or training." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) (district court abused its discretion in barring witness from testifying as an expert with respect to the production of a chemical where the witness, a chemical engineer, was, based on his education and training, familiar with production equipment and processes in the chemical production industry though he did not have experience in chemical plants that produced the product at issue). The district court's laser focus on Dr. Eagar's perceived lack of experience designing CSST was therefore inappropriate and an

31

abuse of discretion as the district court failed to explain how Dr. Eagar was otherwise unqualified to give the proffered opinion testimony. Thus, "[t]he flaw in the district court's decision is that it relied on an overly pinched application of the qualification prong of Rule 702." *Exum v. Gen. Elec. Co.*, 819 F.2d 1158, 1163 (D.C. Cir. 1987) (district court abused its discretion in barring professional engineer with experience with occupational injuries and issues of safety and health from testifying that a fryer was unsafe because he had no experience with kitchen equipment and kitchen design). "The rule does not require the expert to have personal familiarity with the subject of his testimony; 'experience' is only one among the five different ways to demonstrate an expert is qualified." *Id.*

Finally, a requirement that an expert witness in a products liability lawsuit have design or manufacturing experience with the particular product at issue would be unworkable in practice and offend public policy. In *DaSilva v. Am. Brands, Inc.*, the First Circuit rejected a manufacturer's argument that it "should constrain a trial court to admit testimony only from mechanical engineers who have had design experience with the specific machine in question." 845 F.2d 356, 361 (1st Cir. 1988). The court reasoned that "[s]uch an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending its design." *Id.* Thus, the court reaffirmed the "general rule that a

32

court should consider all relevant qualifications when ruling on the admissibility of expert testimony." *Id.*

CSST gas line manufacturers are few in number. A requirement that an expert adverse to a CSST gas line manufacturer have CSST product design experience would set the fox to guard the henhouse:

> If the only experts permitted to testify inevitably represent the same side of a civil case, those who possess these experts can, for all practical purposes, set their own standards. And allowing an industry to do this is improper because it is very similar to what has long since been held inappropriate, namely, letting the custom of an industry or trade define what is reasonable in that trade. *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

Federal courts have long been on guard against industry in this regard:

> If we were to declare as a rule of law that one must actually have practical experience in a given industry in order to qualify as an expert in litigation involving its products, we might very well place an onerous burden on plaintiffs in some cases. Where the industry is small and tightly knit, it may be very difficult for the plaintiff to obtain the services of an expert currently employed therein, and it might be equally difficult to find someone who was formerly employed in the industry. But the key experts of an industry would normally be available to the defendant. *Knight v. Otis Elev. Co.*, 596 F.2d 84, 88 (3d Cir. 1979) (quoting *Trowbridge v. Abrasive Co. of Phila.*, 190 F.2d 825, 829 & n.9 (3d Cir. 1951)).

A proper inquiry, therefore, takes into all of Rule 702's criteria with respect to qualifying an expert witness. Requiring an expert to have experience with a particular product would forever handicap in litigation parties adverse to the manufacturing industry.

> ## 2. *The District Court Placed Inappropriate Reliance on Extra Jurisdictional Rulings Concerning Dr. Eagar's Lack of Qualifications to Testify on Issues Outside the Scope of the Opinion at Issue*

The district court's extraordinary reliance on evidentiary orders from the Western District of Kentucky further illustrates the district court's abuse of its discretion in ruling that Dr. Eagar was not qualified to give opinion testimony on the design issue. In the order barring Dr. Eagar from testifying with respect to product design and again in its order denying American Auto's motion for a new trial, the district court cited *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No. 10-cv-00670, 2013 U.S. Dist. LEXIS 69005 (W.D. Ky. May 15, 2013) as authority for finding Dr. Eagar unqualified to testify that TracPipe was defective from a material selection standpoint. (ECF No. 96, at 13; ECF No. 209, at 7). The May 15, 2013 order by the Western District of Kentucky, however, concerned Dr. Eagar's opinions "that Omega Flex's conduct violated the standard of care applicable to manufacturers when Omega Flex failed to warn the public of the danger posed by Tracpipe even after it became aware of the risk of lightning induced failures." *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No. 10-cv-00670, 2013 U.S. Dist. LEXIS 69005, at *3 (denying plaintiff's motion to reconsider the exclusion of Dr. Eagar's opinions on the standard of care of manufacturers and warnings).

Dr. Eagar's opinions at issue in *Cincinnati Ins. Co. v. Omega Flex* concern a post-sale duty to warn—an issue not present in this lawsuit. Dr. Eagar's warnings

34

opinions in that case are clearly distinct from the *design* opinion at issue in this

case. Furthermore, it appears that the district court ignored the order underlying

the motion for reconsideration in *Cincinnati Ins. Co. v. Omega Flex*, where Judge

Heyburn of the Western District of Kentucky concluded that Dr. Eagar was

qualified "to testify as to causation and defective design, to the extent such

opinions are metallurgical in nature." *Cincinnati Ins. Co. v. Omega Flex, Inc.*, No.

10-cv-00670, 2013 U.S. Dist. LEXIS 49378, at *2 (W.D. Ky. April 5, 2013). Thus

the Western District of Kentucky found Dr. Eagar fit to testify concerning the

design of TracPipe—precisely the opinion proffered by American Auto in this

litigation, yet the district court here used this same order as a basis to say Dr. Eagar

could not testify regarding defective design.[13]

> 3.  *Rule 702 Favors the Admission of Expert Testimony and Any Personal
>     Concerns Harbored the District Court with Respect to Dr. Eagar's
>     Qualifications Should Have Been Tendered to the Jury for
>     Consideration*

The district court inappropriately wrested from the jury the role of assessing

Dr. Eagar's credibility when it came to the issue of his opinions on design and

---

[13] The district court also relied on *More, JB, Inc. v. Nutone Inc.*, No. 05-CA-338, 2007 U.S. Dist. LEXIS 102151, at *16 (W.D. Tex. Mar. 21, 2007) in which a court would not permit Dr. Eagar to opine to the use of an additional thermal cutoff device as a feasible alternative in a small electric motor but found Dr. Eagar qualified to offer opinions on the placement of a cutoff and a conservative motor design that would operate at a lower temperature "because they appear to involve his expertise in materials and metallurgy more than they involve design of small motors or fans."

35

material selection. "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006). Further, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Wen Chyu Liu*, 716 F.3d 159 (5th Cir. 2013); *Martin v. Fleissner GmbH*, 741 F.2d 61, 64 (4th Cir. 1984) ("[T]he lack of direct experience is not a sufficient basis to reject [expert] testimony, but may affect the weight that testimony is given, a decision properly made by the jury."). Thus the jury and not the district court should have been left free to evaluate the impact, if any, the fact that Dr. Eagar had never before designed a "CSST system" on Dr. Eager's design opinions.

**C.  The District Court Did Not Apply the Same Standards in Evaluating the Qualifications of Dr. Kytomaa to Give Metallurgical Opinions as the Court Did with Respect to Dr. Eagar's Design Defect Opinions**

Dr. Kytomaa should not have been allowed to criticize Dr. Eagar's metallurgical analysis of the holes in the Kosteckis' TracPipe because Kytomaa admittedly has no metallurgical expertise. Kytomaa also admitted he has no expertise in lightning and by the same token should not have been permitted to

36

testify that the magnitude of the lightning energy was insufficient to breach the TracPipe in the Kosteckis' home.

With regard to Dr. Kytomaa, "[t]he real question is, what is he an expert about?" *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (holding that a hydrologist with a subspecialty in flood risk management was not qualified to testify as an expert regarding safe warehousing practices). In this case, Dr. Kytomaa answered the inquiry himself when he admitted to having no expertise in lightning and none in the field of metallurgy. While Dr. Kytomaa took "core courses in electrical engineering" when obtaining his mechanical engineering degree, the subject matter concerned electrical power systems like motors and generators, electrical circuits of the type in electronics. ([Trial Tr. Vol. 4, 157–58]; A. 914–15) While Dr. Kytomaa testified at trial that he studied metals and had "working in the area of materials and metals" for decades, he disavowed having any expertise in the area. Furthermore, Dr. Kytomaa illustrated that his experience in the strengths of materials arena as it related to metals was of the type employed in designing structures—which is irrelevant to the metallurgical issues in this case. ([Trial Tr. Vol. 3, 167–68]; A. 0924–25)

The district court demonstrably employed a different analysis in evaluating the expertise of Dr. Kytomaa than it did in considering Dr. Eagar's qualifications.

37

The district court barred Dr. Eagar from testifying based on the district court's perception that Dr. Eagar had disavowed any expertise in product design. Yet the district court, over American Auto's objection, allowed Dr. Kytomaa, a mechanical engineer, to proceed with his criticisms despite the disavowal of his expertise in the area of metallurgy at trial. This uneven application of what the district court considered to be the appropriate legal standard resulted in undue prejudice to American Auto in that American Auto was prevented from fully presenting its case to the jury while at the same time allowing Omega Flex to present to the jury an unfounded critique of Dr. Eagar's metallurgical investigation. *Cf. Wheeling*, 254 F.3d at 715–16 (allowing a witness to give expert testimony outside his area of expertise constituted an abuse of discretion and resulted in prejudice to the opposing party).

**D.** **Justice Was Miscarried as a Result of the District Court's Erroneous Rulings on Dr. Eagar's Qualifications**

The district court compounded its erroneous rulings with respect to Dr. Eagar's qualifications and opinions when it denied American Auto's motion for a new trial. American Auto's burden at trial was to prove, among other things, that Omega Flex "corrugated stainless steel tubing presented a fire hazard because it did not have a wall thickness capable of sufficiently withstanding energy from an indirect lightning strike, and" that Omega Flex "failed to use ordinary care to

Appellate Case: 14-1783    Page: 47    Date Filed: 07/07/2014 Entry ID: 4172528

design the corrugated stainless steel tubing to be reasonably safe[.]"  ([Trial Tr. Vol. 4, 113]; A. 1076)  On American Auto's claim of strict liability, American Auto was required to prove that TracPipe was "then in a defective condition unreasonably dangerous when put to a reasonably anticipated use."  ([Trial Tr. Vol. 4, 114]; A. 1077)

Dr. Eagar's proffered design opinion testimony was paramount in assisting the jury in evaluating the complex testimony given in this case.  When expert testimony is "crucial to the outcome of [a] case not only with respect to determining the standard of care," the district court's evidentiary rulings must be examined with great care.  See *Voegeli v. Lewis*, 568 F.2d 89, 95 (8th Cir. 1977).  In *Voegeli*, the circuit court held that new trial was appropriate when disputed expert testimony was assigned great importance, the appellant made a strong case at trial and appellants were unfairly prejudiced in the presentation of their case.  *Id.* at *97.

A different result would likely have been reached in this case.  *Rottlund*, 452 F.3d at 731.  Dr. Eagar's opinion that the steel material used in TracPipe CSST was too thin and an improper material selection given its use was crucial to American Auto's case.  This was not lost on Omega Flex, who argued at closing:

> So you're dealing with an act of nature, and you're also dealing with a system that's being criticized by the attorneys here as being defective and unreasonably dangerous. And remember, the only people that have said that this design was defective and unreasonably dangerous

39

are the plaintiff attorneys. Not one of their experts told you from the witness stand under oath, under oath that this design was defective or unreasonably dangerous. From the lips of a lawyer, but not from their experts. ([Trial Tr. Vol. 4, 138]; A. 1101)

A complex and scientific investigation was performed to determine the cause of the fire at the Kosteckis' home which correlated to complex and scientific testimony at trial. Dr. Eagar's opinion would have provided the much-needed connective tissue between his analysis of the susceptibility of metals to failure as it relates to material thickness and principles of safe design. Moreover, while Dr. Eagar's proffered opinions were well within the bounds of his expertise; Dr. Kytomaa's trial testimony about lightning and metallurgy was not. As a result of the district court's abuse of discretion in this manner, American Auto suffered undue prejudice at trial and is entitled to a new trial. *Wheeling*, 254 F.3d at 720 (district court committed reversible error by, among other things, allowing an expert to testify to matters beyond the scope of his expertise and by improperly excluding evidence).

## CONCLUSION

This Court should reverse the district court's orders of June 11, 2013 and March 5, 2014 that, respectively, excluded design defect opinion testimony of Thomas W. Eagar, Sc.D., P.E., and denied American Auto's motion for a new trial. The district court's analysis of Dr. Eagar's qualifications to give opinion testimony on the design of Omega Flex TracPipe CSST was riddled with errors and, coupled

40

with the district court's acceptance of Dr. Harri Kytomaa's unqualified opinions on the subjects of lightning energy and metallurgy, constituted an abuse of discretion.

It is therefore appropriate to remand this matter to the district court for a new trial.

Respectfully submitted,

COZEN O'CONNOR

s/Anthony J. Morrone
Anthony J. Morrone

Anthony J. Morrone
Thaddeus Baria
COZEN O'CONNOR
333 W. Wacker Drive, Suite 1900
Chicago, Illinois 60606
Phone No: (312) 382-3100
Fax No: (312) 382-8910
Email: amorrone@cozen.com,
     tbaria@cozen.com

Mark E. Utke
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Phone No: (215) 665-2164
Fax: (215) 701-2164
Email: mutke@cozen.com

Stephen D. Hoyne
STEPHEN D. HOYNE ATTORNEY AT LAW
P.O. Box 210
St. Louis, MO 63026-0210
Phone No: (314) 306-6399
Fax No: (636) 225-7818
Email: stevehoyne@charter.net

41

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document, including all headings, footnotes, and quotations, but excluding summary of the case, the table of contents, table of authorities, any addendum containing statutes, rules or regulations, and any certificates of counsel, contains 10,022 words, as determined by the word count of the word-processing software used to prepare this document, specifically Microsoft Word 2007 in Times New Roman 14 point font, which is no more than 14,000 words permitted under Fed.R.App.P. 32(a)(7)(B)(i).

s/Thaddeus Baria
Thaddeus Baria

*Counsel for Appellants*

Dated: July 7, 2014

42

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief and addendum in non-scanned PDF format. I hereby certify that the file has been scanned for viruses and that it is virus-free.

s/Thaddeus Baria
Thaddeus Baria

*Counsel for Appellants*

Dated: July 7, 2014

Appellate Case: 14-1783    Page: 52    Date Filed: 07/07/2014 Entry ID: 4172528

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2014, I electronically filed the Brief of Appellant with the Clerk of the Court for the United States Court of Appeals for the Eight Circuit by using the CM/ECF system. I certify that the following participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Thomas P. Berra Jr.
Neal Frederick Perryman
Oliver H. Thomas
LEWIS & RICE
Suite 2500
600 Washington Avenue
Saint Louis, MO 63101

William J. Conroy
Lynne O'Brien Ingram
CAMPBELL & CAMPBELL
Suite 330
1205 Westlake Drive
Berwyn, PA 19312

I further certify that the following participants in the case are not registered CM/ECF users. On July 7, 2014, two copies of the Brief of Appellant were sent via first-class mail, proper postage prepaid to the following non-CM/ECF participants:

Douglas G. Smith
Diana M. Watral
KIRKLAND & ELLIS
300 N. LaSalle
Chicago, IL 60654

s/Thaddeus Baria
Thaddeus Baria

*Counsel for Appellants*

Dated: July 7, 2014

Appellate Case: 14-1783    Page: 53    Date Filed: 07/07/2014 Entry ID: 4172528